EVANS v. ERIE R. CO.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1914.)

No. 2430.

1. RAILROADS (§ 351*)—CROSSING ACCIDENTS—ACTIONS—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE.

In an action for the death of a person struck by a south-bound train at a crossing, instructions that, if he started right back of a north-bound freight train on a track between him and the south-bound train, to cross within a few feet, that would be negligence, and he could not recover, that, if he could have waited and allowed the freight train to pass and escape injury, but did not, and started as soon as the train was a few feet over the crossing, he could not recover, that, if he started to drive upon the tracks when the freight train was only two or three yards from the crossing, to find for defendant, that, if the only obstruction to his view of the approaching train was the freight train, or the smoke therefrom, to find for defendant, if the smoke or steam was of a temporary nature, and it was his duty to await the removal of such obstructions before attempting to cross, placed a greater burden of care upon decedent than was warranted, since the use of the expression "a few feet," because of its indefiniteness, was consistent with a movement of the freight train far enough to permit a clear view of the track for a sufficient distance.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1193–1211, 1213–1215; Dec. Dig. § 351.*]

2. RAILROADS (§ 351*)—CROSSING ACCIDENTS—ACTIONS—INSTRUCTIONS—CONTRIBUTORY NEGLIGENCE.

In an action for the death of a person struck by a south-bound train at a crossing, an instruction that, if the only obstruction to decedent's view of the approaching train was a north-bound freight train, or the smoke therefrom, and if this was of a temporary nature, and it was his duty to await the removal of such obstruction before attempting to cross, to find for defendant, was erroneous, where there was testimony that the smoke settled toward the south-bound track, as it failed to hypothesize decedent's knowledge of the existence of the smoke as a temporary obstruction to the view, and he would not be negligent in failing to observe an approaching train concealed by the smoke, unless he knew of its presence.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1193–1211, 1213–1215; Dec. Dig. § 351.*]

3. RAILROADS (§ 347*)—CROSSING ACCIDENTS—ACTIONS—EVIDENCE.

In an action for the death of a person in a crossing accident, where negligence was alleged in failing to maintain a watchman, gates, or electric warning bell, and in running the train at a speed of 50 miles an hour, evidence as to other accidents at such crossing, as to complaints by the public authorities to defendant subsequent to such accidents, relative to the claimed dangerous character of the crossing, with the request that gates or watchmen be maintained, and as to narrow escapes from accidents, so far as notice to defendant could be shown, by express information or general public notoriety, should have been admitted to show the dangerous character of the place and defendant's knowledge thereof.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1124–1137; Dec. Dig. § 347.*]

4. RAILROADS (§ 350*)—CROSSING ACCIDENTS—ACTIONS—QUESTIONS FOR JURY.

Whether common prudence and a due regard for the safety of travelers requires gates or a flagman at a railroad crossing, as being especially dangerous, is generally a question of fact for the jury, under all the circumstances of the case.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1152–1192; Dec. Dig. § 350.*]

*For other cases see same topic.& § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

213 F.—9

5. RAILROADS (§ 307*)—CROSSING ACCIDENTS—LIABILITY—DUTY TO MAINTAIN
      GATES OR FLAGMEN.
          A jury would not be warranted in finding that a railroad company
      should maintain gates or flagmen at ordinary country crossings.
          [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 972–977, 979,
      980; Dec. Dig. § 307.*]

6. RAILROADS (§ 307*)—CROSSING ACCIDENTS—LIABILITY—DUTY TO MAINTAIN
      GATES OR FLAGMEN.
          Gen. Code Ohio, § 588, authorizing the Railroad Commission to require
      gates, an alarm bell, or a flagman at crossings declared by it to be dan-
      gerous, does not, as a matter of law, relieve the railroad company from
      liability for a failure to adopt such precautions as the particular circum-
      stances require in the absence of an express direction by the commissioner.
          [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 972–977, 979,
      980; Dec. Dig. § 307.*
          Duty to give warning signals at crossings, see note to Chesapeake &
      O. Ry. Co. v. Steele, 29 C. C. A. 90.]

7. RAILROADS (§ 347*)—CROSSING ACCIDENTS—ACTIONS—EVIDENCE.
          In an action for death in a crossing accident, in which negligence was
      alleged in failing to maintain a watchman, gates, or an electric warning
      bell, evidence as to the practice of running passenger trains at a high
      speed over such crossing on a downgrade was admissible, in connection
      with evidence as to the number of tracks, the grade, the amount and kinds
      of highway travel and railroad traffic, and prior accidents and near acci-
      dents resulting from the nature of the crossing, on the question of whether
      the crossing was unusually dangerous.
          [Ed. Note.—For other cases, see Railroads, Cent.' Dig. §§ 1124–1137;
      Dec. Dig. § 347.*]

In Error to the District Court of the United States for the Northern
District of Ohio; William R. Day, Judge.

Action by David J. Evans, administrator of Reese Edwards, against
the Erie Railroad Company. Judgment on a verdict for defendant,
and plaintiff brings error. Reversed, and new trial ordered.

E. H. Moore and Frank Jacobs, both of Youngstown, Ohio, for
plaintiff in error.

. Hine, Kennedy & Manchester, of Youngstown, Ohio, for defendant
in error.

Before WARRINGTON, KNAPPEN, and DENISON, Circuit
Judges.

KNAPPEN, Circuit Judge. Plaintiff's intestate, while driving with
his wife and daughter across the tracks of defendant at Crab Creek
Crossing, so-called, adjacent to Youngstown, Ohio, was struck and
instantly killed by defendant's passenger train. The wife suffered
fatal injuries from the collision. This suit is brought to recover for
the death of the husband.

The accident occurred on December 21, 1906, at about 4:30 p. m.
It was already dark, and snow was falling. Several hundred feet
west of the crossing Hubbard Road connects with Wick avenue (ex-
tending northerly from Youngstown, and runs easterly across the
creek, and then crosses the railroad tracks practically at right angles.
The Lake Shore and the Erie maintain each a double track at this
point; the two railroads paralleling each other (the Lake Shore being

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

westerly), the tracks being but a few feet apart, and trains running in each direction on each road. From the east end of the bridge to the center of the first Lake Shore track is about 20 feet. There was a heavy upgrade to the north, and thus from the direction of Youngstown, extending for 5 or 6 miles, and embracing the crossing. Decedent waited on the bridge for the passage of a long freight train going north on the nearest Lake Shore track (upgrade), propelled by one engine ahead and two pusher engines. After the freight train had passed decedent started to cross the tracks and was struck by the Erie south-bound passenger train, which was running in a direction opposite to that of the Lake Shore freight, and on the second track east from that on which the freight was running; the two tracks being about 30 feet apart from center to center. The Erie train was thus going downgrade, and was behind time and coasting. Defendant is charged with negligence in failing to maintain a watchman, gates, or electric warning bell at the crossing, in failing to give warning of the train's approach by bell or whistle, and in running at an alleged negligent speed of 50 miles per hour. No gates, watchman, or other safeguard of that nature had ever been maintained, so far as suggested by the record. There was evidence tending to show negligence in each of the other respects charged. Defendant denied negligence on its part, and alleged contributory negligence on the part of deceased. Trial was had to a jury, which rendered verdict for defendant.

The complaints which we shall discuss are, first, that the court excluded as a ground of actionable negligence the failure to provide a watchman or gates at the crossing; second, the refusal to permit the plaintiff to show that within 2 years previous to the accident there had been three fatal accidents at this same crossing from Erie south-bound passenger trains, as well as "other numerous escapes from like accidents" in that period; third, that the court in its charge upon the subject of contributory negligence placed too severe a burden on decedent.

1. The charge as to contributory negligence. Decedent was 52 years of age. He operated a farm, a country bank, and a coal mine. His habits were good. He was familiar with the crossing in question, being in the habit of driving over it in going to and from Youngstown. The daughter testified that they waited about 10 minutes after the freight train passed before crossing the railroad tracks (apparently an exaggerated estimate of time); that her mother sat in the middle and was driving, her father being upon the mother's right, the daughter being upon the left side of the carriage, the top being up, and side and back curtains on; that after the freight passed the father told the mother to look up the tracks, and he would look down; that both leaned forward and looked, and that the daughter looked; that both the father and mother continued to look while crossing the tracks, the father saying, "Be careful, there is more than one track;" that no bell or whistle was heard, nor any light seen (except that of the freight); and that there was nothing to indicate the approach of the passenger train until they were struck. The speed of the freight train was variously estimated by those operating it at

from 4 to 12 miles per hour. The point at which the last pusher engine of the freight met the engine of the passenger train was variously estimated at from 100 to 500 feet north of the crossing. The estimates of the speed of the passenger train range from 20 miles to 40 to 50 miles per hour. A pedestrian crossing the track at about the same time as decedent testified that the latter's horse was started when the freight train had gone only from 2 to 3 yards beyond the crossing; another pedestrian, who waited near decedent's carriage while the freight train was passing, estimated that she had gotten about 15 feet beyond the Erie track when the collision occurred.

[1, 2] The jury were instructed:

(a) That, if the Lake Shore train "was there as described by the witnesses, and [decedent] started right back of that train to cross within a few feet, that would be plainly negligence on his part, and he cannot recover. That is quite apparent."

And (b) that, if decedent "could have waited and allowed it [the freight] to pass and escape injury, but he did not, and as soon as the train was a few feet over the crossing he started and was struck, then he cannot recover."

(c) That, if decedent and his wife started to drive upon the tracks when the rear end of the freight train "was only 2 or 3 yards over the crossing, your verdict should be for the defendant."

And (d): "I will say to you, as a matter of law, that if the only obstruction to decedent's view of the approaching train was in passing of the Lake Shore freight train, or the smoke from the engine thereof, your verdict must be for the defendant, if, under the other instructions I have given you, you find this smoke or steam was of a temporary nature, and it was his duty to await the removal of such obstruction after the Lake Shore train left before attempting to cross the tracks."

Defendant construes the first three paragraphs of these instructions—which we have indicated as (a), (b), and (c)—as meaning only that, if decedent drove upon the tracks immediately in the rear of the freight train, "without waiting a sufficient time to enable him to have a proper view of the track," no recovery could be had.

If this is all the instruction meant, it would not be subject to criticism. But we think the use of the expression "a few feet" was unfortunate in its indefiniteness, and that the use of that term might be consistent with a movement of the freight train far enough to permit a clear view of the Erie track for a sufficient distance. Moreover, there was testimony that the smoke from the rear pusher engine of the freight train settled in a southeasterly direction, which would be toward the Erie track. If decedent did not know of the presence of this smoke, he would not be negligent in failing to observe an approaching train concealed thereby. While, in one portion of the charge, *decedent's knowledge* of the existence of this smoke as a temporary obstruction to the view was evidently intended to be submitted as an ingredient of contributory negligence,[1] yet, in the later in-

---

[1] The previous instruction was in these words:
"There is some testimony as to the escape of smoke and steam. It is well-established law that, when a traveler approaches a crossing, and there is a

struction above quoted, the question of such knowledge, if not eliminated, was not clearly made necessary to a finding of contributory negligence. We are constrained to think that the learned trial judge thus imposed upon decedent a greater burden of care than was warranted.

[3] 2. Proof of other accidents. The record is somewhat inartificial; but we think it should be construed as meaning that plaintiff offered to give evidence of other accidents and near accidents as before referred to, and that this offer was excluded and exception reserved. The rule is well settled in the federal courts that testimony of other accidents in the same place is admissible not only to show the dangerous character of the place, but also that knowledge thereof was brought to the attention of those responsible therefor. The alleged dangerous character of the crossing would naturally affect the question whether a given speed was negligent or not, as well as whether gates or flagmen were reasonably necessary. In District of Columbia v. Armes, 107 U. S. 519, 525, 2 Sup. Ct. 840, 845 (27 L. Ed. 618), which was an action for injuries by reason of a defective sidewalk, Mr. Justice Field said:

"The frequency of accidents at a particular place would seem to be good evidence of its dangerous character—at least it is some evidence to that effect. * * * Besides this, as publicity was necessarily given to the accidents, they also tended to show that the dangerous character of the locality was brought to the attention of the city authorities."

In Chicago & N. W. Ry. Co. v. Netolicky (C. C. A. 8th Cir.) 67 Fed. 665, 672, 14 C. C. A. 615, which was an action against a railway company for damages for an accident at a grade crossing, it was held proper to permit witnesses familiar with the locality to testify to narrow escapes they had had at the same crossing, in connection with descriptions of the locality, for the purpose of showing the nature of the crossing and the difficulties of travelers in passing over it. In Patton v. Southern Ry. Co. (C. C. A. 4th Cir.) 82 Fed. 979, 983, 27 C. C. A. 287, the rule of the admissibility of proof of other accidents was applied in the case of the derailment of a train at a sharp curve at the foot of a steep grade. See, also, Smith v. Sherwood Township, 62 Mich. 159, 165, 28 N. W. 806, where, in an action for negligently permitting a hole to remain in a bridge, at which a horse became frightened, evidence that other horses had shied at the same hole was held admissible.

We think testimony of accidents at this crossing from Erie southbound passenger trains should have been received, as well as proof of alleged complaints by the public authorities to the defendant subse-

temporary bank of steam and smoke, he should wait until it clears up, and, if he does not stop, he is guilty of contributory negligence. And if this man Edwards saw the bank of smoke and steam from this train, the Lake Shore engine, and he disregarded it and drove across, he cannot recover in this action.

"As I said before in reference to this Lake Shore train moving across there, if he could have waited and allowed it to pass and escape injury, but he did not, and as soon as the train was a few feet over the crossing he started and was struck, then he cannot recover."

The last paragraph contains the clause we have above indicated as (b).

quent to such accidents relating to the claimed dangerous character of the crossing with the request that gates or watchmen be maintained thereat. We think, also, that testimony of narrow escapes therefrom should have been admitted, so far as testimony should be produced tending to show notice to defendant thereof either by express information or general public notoriety.

[4-6] 3. The duty to maintain gates or watchmen. The Ohio statute does not provide that compliance with crossing signals by way of bell and whistle shall excuse a railroad from taking other precautions, even to the extent of providing gates or a watchman, provided the situation be such that common prudence and due regard for the safety of travelers at the particular place and time require such further precautions; and, as a general rule, whether such care and prudence require gates or flagmen at a given crossing, as being especially dangerous, is a question of fact for the jury, under all the circumstances of the case. Gd. Trunk Ry. Co. v. Ives, 144 U. S. 408, 420, 12 Sup. Ct. 679, 36 L. Ed. 485; Erie R. R. Co. v. Weinstein (C. C. A. 6th Cir.) 166 Fed. 271, 274, 92 C. C. A. 189; Rothe v. Pennsylvania Co. (C. C. A. 6th Cir.) 195 Fed. 21, 25, 114 C. C. A. 627; Railway Co. v. Schneider, 45 Ohio St. 678, 694, 17 N. E. 321; Newport News & M. V. Co. v. Stuart's Adm'r, 99 Ky. 496, 502, 36 S. W. 528; Hubbard v. Boston & Albany R. R. Co., 162 Mass. 132, 135, 38 N. E. 366; Baltimore & Ohio R. R. Co. v. Stanley, 54 Ill. App. 215, 221. A jury, however, would not be warranted in saying that a railroad company should maintain these extra precautions at ordinary country crossings. Gd. Trunk Ry. Co. v. Ives, supra; Erie R. R. Co. v. Weinstein, supra; Railway Co. v. Reynolds, 23 Ohio Cir. Ct. R. 199, 201; Commonwealth v. Boston & W. R. Corporation, 101 Mass. 201, 203; Telfer v. Northern R. R. Co., 30 N. J. Law, 188, 193. As said in the Ives Case (at page 421 of 144 U. S., at page 684 of 12 Sup. Ct. [36 L. Ed. 485]):

"It seems, however, that before a jury will be warranted in saying, in the absence of any statutory direction to that effect, that a railroad company should keep a flagman or gates at a crossing, it must be first shown that such crossing is more than ordinarily hazardous; as, for instance, that it is in a thickly populated portion of a town or city, or that the view of the track is obstructed either by the company itself or by other objects proper in themselves, or that the crossing is a much traveled one, and the noise of approaching trains is rendered indistinct and the ordinary signals difficult to be heard by reason of bustle and confusion incident to railway or other business, or by reason of some such like cause."

We think there is nothing in the Ohio statute—Gen. Code, § 588— (authorizing the Commission to require gates, alarm bell, or a flagman) which, as matter of law, relieves the railroad company from failure to adopt such precautions as the particular circumstances may require, even in the absence of express direction by the Commission. The correctness, therefore, of the court's action in thus relieving defendant, as matter of law, from the duty of maintaining gates or watchmen depends upon whether the undisputed testimony shows that the crossing in question was merely an ordinary country crossing, or whether there was evidence from which the jury might properly find the presence of such unusual features distinguishing from the ordi-

nary country railroad crossing as reasonably to require the additional precautions.

The crossing in question was just outside the city of Youngstown, and since the accident has been brought within the city limits. This Hubbard Road, or Crab Creek Crossing, was a regular thoroughfare from Youngstown to Hubbard and other places. In the short space of time while decedent was waiting for the passage of the freight train, and attempting to make the crossing, at least four pedestrians crossed the tracks, as well as two other buggies; part of this travel being in one direction and part in another. It appeared that at least two of these pedestrians were factory workers in Youngstown, on their way between their homes and their work. Just west of the track, and abutting on the northerly side of the road, was a lumber manufacturing plant, office and yard, and at the connection of Hubbard Road and Wick avenue there was a small store. The photographs introduced in evidence show several houses in the vicinity of the crossing, but do not indicate a "populous district." It seems inferable from the record that no crossing light was maintained. The testimony as to surrounding conditions, as affecting the dangerous nature of the crossing, is very meager; but it appears from experiments by photography from the crossing that from the center of the Erie track in question, and at various points ranging from 10 to 34 feet west thereof, there was a clear view of 3,300 feet up the track, and at 48 feet west of that track a clear view of 2,500 feet, and at 74 feet distance a 700 feet view. We have found no satisfactory evidence as to the actual extent and nature of the railroad traffic over this crossing, or the extent of the highway travel thereover. As to the latter, the testimony is generally to the effect that the crossing was "much used" or "much traveled." One witness (the fireman of the Erie train in question) testified (by an affirmative answer to a leading question) that he knew the crossing was "greatly used, * * * particularly so"; and the same witness, in answer to a question whether the reason for keeping the bell ringing between Hubbard and Youngstown (about 7 miles) was that they "were going down hill and dangerous crossings," said:

"It is dangerous all the way down and you got different things to look out for and besides shutting off the bell all the time."

[7] As there must be a new trial, on which the testimony may be more complete than in the record before us, we do not determine whether there was sufficient evidence of an unusually dangerous crossing to justify submitting the question to the jury, adding, however, that, in our opinion, evidence of what we understand to be alleged by plaintiff as a practice of running Erie passenger trains at high speed over this crossing on a downgrade is proper to be taken into account, in connection with other conditions (including the number of tracks, the grade, the amount and kinds of highway travel and railroad traffic, and prior accidents and near accidents so far as shown to have resulted from the nature of the crossing), in determining the presence or absence of an unusually dangerous crossing.

The judgment of the district court is reversed, and a new trial ordered.